UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN BURDA, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ACE LIMITED, EVAN GREENBERG, BRIAN DUPERREAULT, DOMINIC J. FREDERICO, CHRISTOPHER Z. MARSHALL, and PHILIP V. BANCROFT, <br><br><br> Defendants. | 04 CV 8335 <br><br> **CIVIL ACTION NO.** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's Complaint, alleges upon the investigation made by and through plaintiff's counsel, which included, *inter alia*, a review of relevant public filings made by ACE Limited ("ACE" or the "Company") with the Securities and Exchange Commission (the "SEC"), as well as tele-conferences, press releases, news articles, analyst reports, and media reports concerning the Company. This complaint is based upon plaintiff's personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

**SUMMARY OF ACTION**

1.    This is a class action on behalf of all persons, other than defendants, who purchased ACE securities during the period from May 30, 2002, through 10:58 a.m., Eastern Time on October 14, 2004, inclusive (the "Class Period") to recover damages caused by defendants' violations of the federal securities law.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts, practices and transactions complained of herein occurred in substantial part in this District and ACE has operations in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Steven Burda purchased shares of ACE common stock as set forth more fully in the annexed certificate and suffered economic damages.

7.      Defendant ACE ACE is a holding company that, through its subsidiaries, provides a range of insurance and reinsurance products to insureds worldwide.  ACE is incorporated in the Cayman Islands with its corporate headquarters located at 17 Woodbourne Avenue, Hamilton HM 08, Bermuda.

8.      The defendants listed below served, during the period specified, as senior officers and/or directors of ACE:

(a)      Defendant Evan Greenberg ("Greenberg") has served as the Company's President and Chief Executive Officer ("CEO") since May 2004.  Prior to assuming that

role, defendant Greenberg served as the Company's President & Chief Operating Officer ("COO") beginning June 2003 through May 2004, and as the Vice Chairman of ACE Limited and CEO of ACE Tempest Re. beginning November 2001.

(b)    Defendant Philip V. Bancroft ("Bancroft") has served as the Company's Chief Financial Officer ("CFO") since January 2002.

(c)    Defendant Brian Duperreault ("Duperreault") is currently the Company's Chairman and served as the Company's Chairman and CEO from November 1999 to May 2004.

(d)    Defendant Dominic J. Frederico ("Frederico) served as President and COO of ACE and Chairman of ACE INA from November 1999 until June 2003.  In June 2003, defendant Frederico became vice chairman of ACE, with continued responsibility for Ace's North American operations, including Ace USA, Ace Westchester Specialty Group and Ace Bermuda, as well as for all of Ace's financial lines of business.

(e)    Defendant Christopher Z. Marshall ("Marshall") served as the Company's CFO from November 1992 until January 2002, when he became executive assistant to ACE chairman Brian Duperreault.

9.    Defendants Greenberg, Bancroft, Duperreault, Frederico and Marshall are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ACE's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to

be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, each defendant had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present

and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with ACE, each of the defendants had access to the adverse undisclosed information about ACE's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about ACE and its business issued or adopted by the Company materially false and misleading.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of ACE during the Class Period and who suffered damages (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's report filed on Form 10-Q with the SEC on August 9, 2004, ACE had approximately 284,018,700 shares of common stock outstanding as of August 4, 2004. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ACE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as plaintiff purchased ACE stock during the Class Period and all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of ACE; and

(c)    whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)    whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)    whether the members of the Class have sustained damages and the proper measure of such damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

7

## SUBSTANTIVE ALLEGATIONS

### Fraudulent Scheme and Course of Business

20.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ACE securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  Specifically, the Company inflated its earnings and revenues during the Class Period by utilizing and participating an unsustainable business practice whereby the Company, along with others that were complicit in the scheme, executed a business plan under which it agreed to pay illicit "contingent commissions" in order to create artificial demand for its insurance products through the steering of customers to ACE insurance products by purportedly independent brokers.  Moreover, the scheme resulted in ACE receiving premiums and other fees from clients that were artificially inflated as a result of the scheme through which, ACE, and others, engaged in price-fixing and bid-rigging activities that enabled the Company to both sell products and services at artificially inflated prices and to complete sales that would otherwise not have occurred.  Defendants' fraudulent scheme and course of business: (i) deceived the investing public regarding ACE 's business, operations, management and the intrinsic value of ACE securities; and (ii) caused plaintiff and other members of the Class to purchase ACE securities at artificially inflated prices.

### Background Facts

21.     ACE is the Bermuda-based holding company of the ACE Group of Companies incorporated with limited liability under the Cayman Islands Companies Law.  Through its various operating subsidiaries, ACE provides insurance and reinsurance products to insureds worldwide through operations in the U.S. and almost 50 other countries.  As an insurance and

reinsurance company, the Company generates gross revenues from two principal sources, premiums which are usually paid in advance of loss payments, and dividends and interest income earned on invested assets.

22.     During the Class Period, ACE engaged in a plan whereby it paid "contingent commissions" to brokers, including those employed by Marsh & McLennan Companies, Inc. ("MMC"), and its subsidiaries (collectively "Marsh"), to steer business toward itself and shield itself from competition.  In effect, ACE paid kick-backs to insure that it could charge premiums that it otherwise would be unable to obtain through a free market system and keep customers who would otherwise gravitate toward ACE's competition.  Moreover, its participation in the scheme subjects it to substantial fins and penalties.

## The Scheme

23.     Defendant Greenberg is the brother of Jeffrey Greenberg, Chairman and CEO of MMC.

24.     There are basically three types of entities in the insurance market. First, there are clients seeking to purchase insurance for their businesses, employees or themselves. Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client in obtaining a variety of insurance policy offerings from different insurance companies and recommending to clients the policy which they feel is optimal for the client.  Such analysis includes analyzing differences in coverage, the financial security of the insurer and the reputation of the insurance company.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.  ACE falls into the third category, an insurance company.

25.     In this structure, the client makes two types of payments: (1) advisory fees or commissions paid to the broker for services in assisting them in finding the optimal insurance policy, and (2) the insurance premium paid to the insurance company for the coverage itself. When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients -- particularly large commercial clients -- break out the broker's fee and pay it directly to the broker.

26.     In addition to the first commission payment described above, brokers sometimes receive contingent commissions from the insurance company with whom they placed the insurance policy pursuant to arrangements generally known as contingent commission agreements. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

27.     In the late 1990s, Marsh began to call these agreements "Placement Service Agreements" or "PSAs," and, more recently, after public scrutiny, "Market Services Agreements" or "MSAs," contending that they do not reflect payment for "a specific transaction or placement" but relate instead to the "services we provide" to insurance companies. Unbeknownst to Marsh's clients or ACE shareholders, these "services" include steering business to complicit and profiting insurance companies by, among other things, rigging bids and fixing prices.

28.    During the Class Period, ACE entered into numerous MSAs and made substantial "contingent commission" payments to insurance brokers pursuant to these agreements and, additionally, effectuate the bid-rigging and price-fixing scheme.  According to a complaint filed by New York Attorney General Eliot Spitzer on October 14, 2004, Marsh and numerous insurance companies, including ACE, had effectuated the illegal bid-rigging and price fixing scheme by 2000.   The bid-rigging scheme was carried out, in part, through a combination of a single fixed bid and a series of fake bids submitted to Marsh by the complicit insurance companies, at Marsh's request, in order to create the appearance of a truly competitive market whereby bona fide bids are submitted by insurance companies in an effort to attain the business of an insurance purchaser.  Rather than legitimate bids, Marsh directed the pre-determined winner of the contract to submit a price-fixed bid (since that insurance carrier knew they would not be underbid) and, contemporaneously, directed other insurance carriers to submit bids above those of the winning bid.  These "losing bidders" were, of course, awarded in other instances whereby they would be the winner of the price-fixed auction.

29.    The following example sets forth the general mechanism of the illegal scheme.  Where ACE was the incumbent carrier (the incumbent carrier often protected from competition by the scheme) and the policy was up for renewal, and Marsh had determined to direct the business to ACE, Marsh would provide ACE with a target premium and the policy terms for the quote.  If ACE agreed to the quote and policy terms, ACE would be awarded the contract, regardless of whether ACE could have quote more favorable terms or premium (the determination of such is, in part, the purpose of competitive bidding).  In instances where the policy up for renewal was not with ACE, Marsh would direct ACE to provide a secondary quote, variously referred to as a "backup quote," "protective quote" or "B Quote" at a rate higher than

that of the incumbent insurer who Marsh intended to direct the contract. In such cases, Marsh would either provide a target premium to ACE that was higher than the rigged winning bid or Marsh would not set a particular premium target but would allow ACE to examine the expiring policy terms and premium so that it would be able to present a bid that was likely above that which an incumbent carrier would bid. Lastly, in situations where there was no incumbent carrier to protect, Marsh would often provide premium targets to those bidding, although at times, there was an understanding that there was the possibility of real competition.

30.    In 2002, ACE entered the excess casualty market through a separate division, called the Casualty Risk Department. ACE entered into a contingent commission agreement in order to obtain access to the business Marsh controlled. During the Class Period, ACE repeatedly provided B Quotes to Marsh in amounts requested by marsh, even though a lower quote would have been justified by an underwriting analysis.

31.    An example of the operation of this system is evident in the bidding for the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine. On December 17, 2002, an ACE assistant vice president of underwriting sent a fax to Greg Doherty, a senior vice president in Marsh Global Broking's Excess Casualty division, quoting an annual premium of $990,000 for the policy. Later that day, ACE revised its bid upward to $1,100,000. On the fax cover sheet with the revised bid, ACE's assistant vice president wrote: "Per our conversation attached is revised confirmation. All terms & conditions remain unchanged." An email the next day from the assistant vice president to an ACE vice president of underwriting explained the revision as follows: "Original quote $990,000 . . . . We were more competitive than AIG in price and terms. MMGB [Marsh & McLennan Global Broking]

requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. "

32.     The bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products), further demonstrates the bid-rigging scheme. In June of 2003, ACE learned that Brambles was unhappy with the incumbent carrier. Despite this, Marsh asked ACE to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business.   ACE continued to provide Marsh with inflated quotes into 2004.

33.     Defendant Greenberg's father, Maurice R. "Hank" Greenberg, is the Chairman and CEO of AIG.

34.     The statements set forth below concerning the Company's revenue growth, earnings, financial performance and  its compliance with applicable rules and regulations, were each false and misleading.  As set forth herein, the Company's payments of fraudulent "contingent commissions" and its active participation in the bid-rigging scheme violated numerous state law regulations concerning fair practices and antitrust regulations, inflated revenues and earnings, and subjects the Company to significant penalties, fines, and loss of customer confidence.  Defendants' disguised kick-back scheme created extensive earnings and revenue for the Company that it failed to disclose was unsustainable due to the nature of the scheme and that, as a result, the Company's earnings and revenues would eventually fall.

35.     As a result of defendants' material omissions regarding its unsustainable business practice alleged herein, the investing public (including plaintiff and other members of the Class) could not and did not understand or assess the extent to which ACE's ongoing operations,

reported revenue, earnings, and net income were dependent upon its involvement in the price-fixing and bid-rigging scheme.

36.    Therefore, the investing public (including plaintiff and other members of the Class) could not and did not understand or assess the extent to which ACE's future operations, revenue, earnings, and net income would be dependent upon the bid-rigging scheme and kick-back scheme.

37.    As a result of defendants' material omissions regarding its unsustainable business practice alleged herein, the investing public (including plaintiff and other members of the Class) could not and did not understand or assess the risk to which ACE's operations, reported revenue, earnings, and net income were exposed when the price-fixing and bid-rigging scheme was disclosed.

**Materially False and Misleading
Statements Issued During the Class Period**

38.    On or about May 30, 2002, ACE entered the excess casualty market by creating a separate division, called the Casualty Risk Department (or Casualty Risk group).  On May 30, 2002, ACE issued a press release announcing the appointment of Geoffrey Gregory as president of ACE Casualty Risk.  The press release stated, in relevant part:

> ACE Casualty Risk will provide up to $25M in umbrella/excess coverage to businesses whose annual revenues exceed $200M. Coverage will be offered in the first $50M of risk transfer. Additionally, other new product lines will be announced at a future date.

> "Geoff has an exceptional industry background and brings a wealth of proven experience to the ACE team," said Susan Rivera, president, ACE INA Holdings, Inc. "His keen understanding of casualty underwriting and business development, coupled with his strong leadership skills, make him an excellent complement to ACE's overall business strategy."

> "The current challenges facing the excess casualty product line have created a need for a strong lead excess market. ACE has the financial strength and

14

underwriting capabilities to service this need. ACE's focused business strategy and outstanding people will serve as a solid foundation on which to build the new Casualty Risk business," said Gregory.

Before joining ACE, Gregory held several progressive management roles within AIG including executive vice president and chief operating officer, Excess Casualty Division.

39.     On July 29, 2002, the Company issued a press release announcing "Record Second Quarter Operating Earnings" for the period ended June 30, 2002. Therein, the Company reported net operating income of $236 million for the quarter ended June 30, 2002 compared with $115 million for the same quarter in 2001. Commenting on the financial results, defendant Duperreault stated:

> Evidence of a strong upturn in our business and a more durable hard market continues to mount. We enjoyed significant growth in our property and casualty business, recorded our highest quarterly operating income ever, produced a gain in book value per share against the backdrop of falling equity markets and achieved a 14.6 percent annualized return on average equity for the period.

40.     On August 14, 2002, the Company filed its quarterly report with the SEC on Form 10-Q for its second quarter ended June 30, 2002. The 10-Q reaffirmed the Company's previously announced financial results and was signed by defendants Duperreault and Bancroft. Additionally, the Company stated:

> The interim unaudited consolidated financial statements, which include the accounts of the Company and its subsidiaries, have been prepared in accordance with accounting principles generally accepted in the United States of America and, in the opinion of management, reflect all adjustments (consisting of normally recurring accruals) necessary for a fair presentation of results for such periods. The results of operations and cash flows for any interim period are not necessarily indicative of results for the full year.

41.     On October 29, 2002, the Company issued a press release announcing financial results for its third quarter ended September 30, 2002. Therein, defendant Duperreault commented on the results as follows:

This quarter and our year to date have been characterized by exceptional premium growth. This has helped produce positive cash flow in excess of $1 billion for the quarter. Operating earnings and unrealized gains from our fixed income portfolio more than offset realized losses this quarter, resulting in an increase in book value per share.

42.    The October 29, 2002 press release provided the following information with regard to the Company's underwriting results and the growth in premiums the Company experienced:

Gross premiums written during the September 30, 2002 quarter increased by 41 percent to $3.5 billion, compared with $2.5 billion for the comparable quarter in 2001. Net premiums written increased by 70 percent to $2.2 billion and net premiums earned increased by 37 percent to $1.9 billion.
    Underwriting results improved in the current quarter with a consolidated combined ratio of 97.7 percent compared with 142.5 percent in the prior year quarter. The current quarter includes $90 million after tax losses related to the European floods as previously announced.

43.    On November 14, 2002, the Company filed its quarterly report with the SEC on Form 10-Q for its third quarter ended September 30, 2002. The 10-Q reaffirmed the Company's previously announced financial results and was signed by defendants Duperreault and Bancroft. Additionally, the Company stated:

The interim unaudited consolidated financial statements, which include the accounts of the Company and its subsidiaries, have been prepared in accordance with accounting principles generally accepted in the United States of America and, in the opinion of management, reflect all adjustments (consisting of normally recurring accruals) necessary for a fair presentation of results for such periods. The results of operations and cash flows for any interim period are not necessarily indicative of results for the full year.

44.    On February 5, 2003, the Company issued a press release announcing year end and fourth quarter results for the period ended December 31, 2002. Therein, the Company reported net operating income of $511 million for the full year. The press release provided the following information with regard to the Company's underwriting results and the growth in premiums the Company experienced:

16

Net premiums written increased 7 percent over the prior quarter a year ago. Property and casualty net premiums written (exclusive of Life Reinsurance and Financial Services) increased by 54 percent compared with the fourth quarter of 2001. Life Reinsurance and the Financial Services segments declined 86 percent and 43 percent, respectively.

Net premiums written for the year ended December 31, 2002, increased by 27 percent compared with 2001. Property and casualty net premiums written (excluding the Financial Services segment and the Life Reinsurance division) increased 43 percent over prior year levels.

45.     Commenting on the Company's financial results, defendant Duperreault stated, "Our core property and casualty business grew rapidly, generating significant cash flow and very satisfactory underwriting profitability."

46.     On March 27, 2003, the Company filed its Annual Report with the SEC on Form 10-K for its fiscal year ended December 31, 2002.  The 10-K repeated the Company's previously announced financial results and was signed by defendants Duperreault, Bancroft, Greenberg and Frederico, among others.  In the Annual Report, the Company commented as follows on commissions:

For most of the commercial lines of business that we offer, insureds typically use the services of an insurance broker. An insurance broker acts as an agent for the insureds, offering advice on the types and amount of insurance to purchase and also assisting in the negotiation of price and terms and conditions. We obtain business from all of the major international insurance brokers and typically pay a commission to brokers for any business accepted and bound. In our opinion, no material part of our business is dependent upon a single customer or group of customers. We do not believe that the loss of any one customer would have a materially adverse effect on us and no one customer or group of affiliated customers accounts for as much as ten percent of our consolidated revenues.

47.     The Annual Report filed with the SEC on March 27, 2003, set forth the following information with regard to regulation of ACE's insurance business within the United States:

Operations in the United States of America

Although at the present time there is limited federal regulation of the insurance business in the U.S., the U.S. insurance subsidiaries are subject to extensive regulation in the states in which they do business. The laws of the various states establish supervisory agencies with broad authority to regulate, among other things: licenses to transact business, soliciting business, advertising, rates for certain business, policy language, underwriting and claims practices, transactions with affiliates, reserve adequacy, dividends, investments and insurer solvency. In addition, the U.S. insurance subsidiaries are subject to judicial decisions that define the risks and benefits for which insurance is sought and provided. These include judicial interpretations of the nature of the insured risk in such areas as product liability and environmental coverages.

Regulations generally require insurance and reinsurance companies to furnish information concerning activities which may materially affect the operations, management or financial condition and solvency of the company. Regulations vary from state to state but generally require that each primary insurance company obtain a license from the department of insurance of a state to conduct business in that state. A reinsurance company does not generally require an insurance license to reinsure a U.S. ceding company. For a U.S. ceding company to obtain financial statement credit for reinsurance ceded, the reinsurer must obtain an insurance license or accredited status from the cedent's state of domicile or must post collateral to support the liabilities ceded. In addition, regulations for reinsurers vary somewhat from primary insurers in that reinsurers are typically not subject to regulator approval of insurance policy forms or the rates agreed to between ceding insurers and their reinsurers.

The U.S. insurance subsidiaries are required to file detailed annual and quarterly reports with state insurance regulators in each of the states in which they do business. Such annual and quarterly reports are required to be prepared on a calendar year basis. In addition, the U.S. insurance subsidiaries' operations and accounts are subject to examination at regular intervals by state regulators. The respective reports filed in accordance with applicable insurance regulations with respect to the most recent periodic examinations of the U.S. insurance subsidiaries contained no material adverse findings.

48.    The Annual Report filed with the SEC on March 27, 2003, provided the following information about the Company's "Controls and Procedures" for the reporting of pertinent information to the investors and regulators:

Our disclosure controls and procedures are designed to ensure that information required to be disclosed in reports filed under the Securities and Exchange Act of 1934 is recorded, processed, summarized and reported within time periods specified in the rules and forms of the SEC. The Chief Executive Officer and the Chief Financial Officer have reviewed the effectiveness of the disclosure controls

18

and procedures within the last ninety days and have concluded that the disclosure controls and procedures are effective. There were no significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the last day they were evaluated by the Chief Executive Officer and Chief Financial Officer.

49.    In the Annual Report filed with the SEC on March 27, 2003, the Company

provides the following comments on the competitive environment of the insurance underwriting

business:

Competition

With over 3,000 insurance and reinsurance companies operating throughout the world, competition in the international insurance and reinsurance marketplace is substantial. Competition varies by type of business and geographic area. We compete for business not only on the basis of price, but also on the basis of availability of coverage desired by customers and quality of service. Our ability to compete is dependent on a number of factors, particularly our ability to maintain the appropriate financial strength ratings as assigned by independent rating agencies. Our strong capital position and global platform affords us opportunities for growth not available to smaller insurance companies. While most of the sectors in which we operate have experienced significant improvement in both price and coverage terms in the past 12 months, competition continues to be considerable, partly because new capital has been invested in the industry to meet capacity shortages in certain lines of business. Competitive information by segment is included in each of the segment discussions.

50.    On February 4, 2004, the Company issued a press release announcing year end

and fourth quarter results for the period ended December 31, 2003.  Therein, the Company

reported operating income of $1.4 billion for the full year.  The press release provided the

following financial highlights:

Other 2003 operating highlights were as follows:

- · Net premiums written increased 27% to $10.2 billion, reflecting P&C net premium growth of 40%

- · The P&C combined ratio was 91.1% for the year compared with 103.0% a year ago

- · Operating cash flow amounted to a record $4.2 billion for the year

· Cash and invested assets increased by $5.3 billion

· Net investment income increased 7% to $861 million

· Shareholders' equity increased 38% to $8.8 billion

· Tangible equity rose to $6.1 billion, a gain of 66% from year-end 2002

· Debt to total capital ratio improved to 16.9% from 20.9% at year-end 2002

· Return on equity for 2003 was a record 15.8%; excluding FAS 115, it was 17.2%

· Diluted book value per share as of December 31, 2003 increased 22% to $29.38(2)

Financial results improved over the prior year's results for virtually every business segment. Further details are available in the financial supplement. Key items include:

· Insurance-North American: Net premiums written increased 38% and the combined ratio improved to 90.6%.

· Insurance-Overseas General: Net premiums written also increased 38%. The segment's combined ratio improved to 93.0%.

· Global Reinsurance: Net premiums written were up 58%, a result of our continued strategy to diversify our reinsurance operations into multi-line reinsurance. This segment had a combined ratio of 75.7%.

· Financial Services: Net income increased 254% for the year reflecting a combined ratio of 94.4%.

51.    In the February 4, 2004, press release, Defendant Duperreault commented on the financial results as follows:

The record results of 2003 reflect the significant earnings power that ACE has built up over the last three years. With annual net income substantially in excess of $1 billion, ACE has established a preeminent presence in the global property and casualty insurance industry. As we look ahead to 2004, we view our prospects for further growth with continued optimism.

52.     On March 15, 2004, the Company filed its Annual Report with the SEC on Form

10-K for its fiscal year ended December 31, 2003.  The 10-K repeated the Company's previously

announced financial results and was signed by defendants Duperreault, Bancroft, Greenberg and

Frederico, among others.  In the Annual Report, the Company commented as follows on

commissions:

> For most of the commercial lines of business that we offer, insureds typically use
> the services of an insurance broker. An insurance broker acts as an agent for the
> insureds, offering advice on the types and amount of insurance to purchase and
> also assisting in the negotiation of price and terms and conditions. We obtain
> business from all of the major international insurance brokers and typically pay a
> commission to brokers for any business accepted and bound. In our opinion, no
> material part of our business is dependent upon a single customer or group of
> customers. We do not believe that the loss of any one customer would have a
> materially adverse effect on us and no one customer or group of affiliated
> customers accounts for as much as ten percent of our consolidated revenues.

53.     The Annual Report filed with the SEC on March 15, 2004, set forth the following

information with regard to regulation of ACE's insurance business within the United States:

> U.S. Operations
> Although at the present time there is limited federal regulation of the insurance
> business in the U.S., our U.S. insurance subsidiaries are subject to extensive
> regulation in the states in which they do business. The laws of the various states
> establish supervisory agencies with broad authority to regulate, among other
> things: licenses to transact business, soliciting business, advertising, rates for
> certain business, policy language, underwriting and claims practices, transactions
> with affiliates, reserve adequacy, dividends, investments and insurer solvency. In
> addition, the U.S. insurance subsidiaries are subject to judicial decisions that
> define the scope of an insurer's duty to defend a claim and the risks and benefits
> for which insurance is sought and provided. These include judicial interpretations
> of the nature of the insured risk in such areas as product liability and
> environmental coverages.
>
> Regulations generally require insurance and reinsurance companies to furnish
> information to their domestic state insurance department concerning activities
> which may materially affect the operations, management or financial condition
> and solvency of the company. Regulations vary from state to state but generally
> require that each primary insurance company obtain a license from the department
> of insurance of a state to conduct business in that state. A reinsurance company is
> not generally required to have an insurance license to reinsure a U.S. ceding

company. However, for a U.S. ceding company to obtain financial statement credit for reinsurance ceded, the reinsurer must obtain an insurance license or accredited status from the cedant's state of domicile or must post collateral to support the liabilities ceded. In addition, regulations for reinsurers vary somewhat from primary insurers in that reinsurers are typically not subject to regulator approval of insurance policy forms or the rates agreed to between ceding insurers and their reinsurers.

Our U.S. insurance subsidiaries are required to file detailed annual and, in some states, quarterly reports with state insurance regulators in each of the states in which they do business. Such annual and quarterly reports are required to be prepared on a calendar year basis. In addition, the U.S. insurance subsidiaries' operations and accounts are subject to examination at regular intervals by state regulators. The respective reports filed in accordance with applicable insurance regulations with respect to the most recent periodic examinations of the U.S. insurance subsidiaries contained no material adverse findings.

54.    The Annual Report filed with the SEC on March 15, 2004, provided the following information about the Company's "Controls and Procedures" for the reporting of pertinent information to the investors and regulators:

As of the end of the period covered by this report, the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Rule 13a-15 under the Securities Exchange Act of 1934. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in allowing information required to be disclosed in reports filed under the Securities and Exchange Act of 1934 to be recorded, processed, summarized and reported within time periods specified in the rules and forms of the SEC.

55.    In the Annual Report filed with the SEC on March 15, 2004, the Company provides the following comments on the competitive environment of the insurance underwriting business:

Competition in the domestic and international insurance and reinsurance marketplace is substantial. Competition varies by type of business and geographic area. We compete for business not only on the basis of price, but also on the basis of availability of coverage desired by customers and quality of service. Our ability to compete is dependent on a number of factors, particularly our ability to maintain the appropriate financial strength ratings as assigned by independent

rating agencies. Our strong capital position and global platform affords us opportunities for growth not available to smaller insurance companies. While most of the sectors in which we operate have experienced significant improvement in both price and coverage terms over the past two years, competition continues to be considerable, partly because new capital has been invested in the industry to meet capacity shortages in certain lines of business. Competitive information by segment is included in each of the segment discussions.

56.    On July 27, 2004, the Company issued a press release announcing financial results for its second quarter ended June 30, 2004.  Therein, the Company reported operating income of $413 million for the second quarter.  The press release provided the following financial highlights:

Other second quarter operating highlights were as follows:

- Net premiums written increased 19% to $2.9 billion, reflecting P&C net premium growth of 25% over 2003

- The P&C combined ratio improved to 89.0% for the quarter compared with 91.7% a year ago

- Operating cash flow amounted to approximately $1.1 billion for the quarter

- Cash and invested assets increased by $546 million from March 31, 2004

- Net investment income increased 12% to $236 million. P&C net investment income increased 24% over 2003

- Shareholders' equity decreased 2% from March 31, 2004, principally because unrealized losses on investments exceeded net income

- Tangible equity decreased to $6.6 billion, a reduction from March 31, 2004 of 1%

- Debt to total capital ratio rose to 19.8% from 16.1% at March 31, 2004. In June 2004, the Company sold $500 million of 10-year senior debt with a 5.875% coupon. The proceeds of this debt were used in July to redeem $75 million of callable debt and will be used in August to refinance a maturing $400 million bond.

· Annualized return on ordinary equity for the quarter ended June 30, 2004 was 16.9%; excluding FAS 115, it was 17.7%

· Diluted book value per ordinary share as of June 30, 2004 decreased 3% to $30.46 from March 31, 2004 (2)

Financial results improved over the prior year's results for virtually every business segment. Further details are available in the financial supplement. Key items include:

· Insurance-North American: Net premiums written increased 37% and the combined ratio improved to 90.3%

· Insurance-Overseas General: Net premiums written increased 21% (11% after foreign exchange impact) and the combined ratio improved to 89.3%

· Global Reinsurance: Net premiums written were up 6% and this segment's combined ratio improved to 76.1%

· Financial Services (adjusted for Assured Guaranty): Income excluding realized gains (losses) increased 37% and the combined ratio improved to 80.6%

57.     In the July 27, 2004, press release, defendant Greenberg commented on the results as follows:

This was an excellent quarter. All of our business segments performed well, which is a reflection of the investments we have made to increase both our product capability and physical presence globally. In light of a softening market, I remain confident in our ability to perform given our underwriting discipline and the diversity of our business opportunities.

58.     On August 9, 2004, the Company filed its quarterly report with the SEC on Form 10-Q for its second quarter ended June 30, 2004. The 10-Q reaffirmed the Company's previously announced financial results and was signed by defendants Duperreault and Bancroft. Therein, the Company repeated statements regarding its "controls and procedures" for the reporting of pertinent information to the investors and regulators.

24

59.    The above statements made by the defendants were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    the Company had implemented and executed an unsustainable business practice whereby the Company participated in a business plan under which it entered into "placement service agreements" with Marsh & McLennan and agreed to pay them "contingent commissions" in return for steering it business and shielding it from competition;

(b)    the Company's illicit scheme exposed it to significant regulatory penalties and threatened loss of consumer goodwill jeopardizing the Company's ability to sustain any performance in its legitimate business practices;

(c)    the Company's revenues and earnings would materially overstated and would have been significantly less had the Company not engaged in such unlawful practices.

(d)    At no time during the Class Period did defendants disclose the fact that, or the extent to which, ACE's business, revenue, and income were dependent upon the unlawful and unsustainable business practices alleged herein.

## THE TRUTH EMERGES

60.    On October 14, 2004, the Attorney General of the State of New York, Eliot Spitzer, announced that as a result of an intensive investigation, the Office of New York State Attorney General had commenced a civil action against Marsh in relation to the alleged conduct set forth herein.  Moreover, Attorney General Spitzer announced that two executives at American International Group, Inc. ("AIG") had pleaded guilty to criminal charges arising out of the scheme.  The press release announcing the initiation of the action, stated, as follows:

## INVESTIGATION REVEALS WIDESPREAD CORRUPTION IN INSURANCE INDUSTRY

Leading Brokerage Firm Sued for Fraud and Antitrust Violations; Insurance Company Executives Plead Guilty; Major Insurance Firms Implicated

Attorney General Eliot Spitzer today sued the nation's leading insurance brokerage firm, alleging that it steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts.

Simultaneously, Spitzer announced that two insurance company executives have pleaded guilty to criminal charges in connection with the scheme.

The actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry. Evidence revealed in today's lawsuit also implicates other major insurance carriers.

"The insurance industry needs to take a long, hard look at itself," Spitzer said. "If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform."

"There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers," he added.

Spitzer was joined at news conference announcing the actions by New York State Insurance Superintendent Gregory V. Serio, who said: "This has gone from an inquiry into failure to disclose compensation to an active investigation of bid rigging and improper steering. This certainly proves the adage that where there is smoke, there is fire."

The civil complaint filed today in State Supreme Court in Manhattan alleges that for years Marsh received special payments from insurance companies that were above and beyond normal sales commissions. These payments -- known as "contingent commissions" -- were characterized as compensation for "market services" but were, in fact, rewards for the business that Marsh and its independent brokers steered and allocated to the insurance companies. Industry representatives defend this long-standing practice as acceptable and even beneficial to clients, but the Attorney General's office has uncovered extensive evidence showing that it distorts and corrupts the insurance marketplace and cheats insurance customers.

In addition to steering business to its insurance company partners, Marsh, at times, solicited fake bids, which deceived its customers into thinking that true competition had taken place. Marsh did this even as it claimed in public

statements that its "guiding principle" was to always consider its client's best interests.

Spitzer's complaint against the company cites internal communications in which executives openly discuss actions that were aimed at maximizing Marsh's revenue and insurance companies' revenues -- without regard to clients' interests.

For example, one senior Marsh executive sent a message to colleagues saying: "We need to place our business in 2004 with those [insurance companies] that have superior financials, broad coverage and pay us the most."

Another executive noted that the size of contingent commissions will determine "who [we] are steering business to and who we are steering business from."

*    *    *

The two executives pleaded guilty to participating in the illegal conduct and are expected to testify in future cases.

According to the complaint, Marsh collected approximately $800 million in contingent commissions in 2003. Spitzer's civil complaint seeks an end to the steering and bid rigging, disgorgement of improper payments, restitution and punitive damages.

61.    On October 15, 2004, *The Wall Street Journal* published an article reporting on

the investigation, that stated, in pertinent part:

Spitzer Charges Bid Rigging In Insurance

Marsh & McLennan Cos., the world's biggest insurance broker, cheated corporate clients by rigging bids and collecting huge fees from major insurance companies for throwing business their way, according to allegations made by New York Attorney General Eliot Spitzer.

Mr. Spitzer's charges came in a civil suit as well as in plea-bargain deals on criminal charges against two insurance executives.

*    *    *

In general, insurance brokers serve as middlemen, matching buyers and sellers, and Marsh long has been the leader in the business. For their part, the insurers linked to its alleged wrongdoing are some of the leaders in selling property-casualty coverage to businesses around the world. Industrywide, premiums paid last year just in the U.S. totaled $176 billion.

In essence, Mr. Spitzer maintains that Marsh steered business toward certain insurers at designated prices, and then would solicit "B" bids, or artificially high fake bids, from other insurers to give the appearance of real bidding. Marsh did this even as it claimed in public statements that its "guiding principle" was to consider its client's best interests, he alleged.

At the heart of the inquiry are fees that many insurance brokers receive from insurance companies over and above their ordinary commissions. Many are paid for steering volume business an insurer's way. Insurance companies call the fees "contingent commissions" or "market service agreements." A growing chorus of critics, including some policyholders who have sued over the practice in state courts in recent years, have used another term: "kickback."

While controversy has swirled over contingent commissions before, prompting some lawsuits, Mr. Spitzer's bid-rigging allegations are new. If true, they could lead to a new wave of corporate and class-action litigation.

The fee arrangements date back several decades. Many industry executives say it was no big secret among insiders that such pacts were in place to boost revenue at both the insurance brokers and the insurance companies that agreed to them. Controversy over them first flared up in the late 1990s, when New York insurance regulators raised concern, saying the payments ought to be disclosed. That controversy died down when the big brokers agreed to provide information on the arrangements -- if asked by clients.

\*       \*       \*

Mr. Spitzer's allegations indirectly touch three members of what might be called the first family of insurance. The chairman and chief executive of AIG is Maurice R. "Hank" Greenberg, while his eldest son, Jeffrey W. Greenberg, a former AIG executive, is chairman and CEO at Marsh. Another son, Evan Greenberg, is president of Bermuda-based Ace. A person familiar with the probe said there is no indication that the family relationships played a role in any of the transactions being investigated. No members of the family have been named in the investigation.

Marsh received $800 million in revenue from the contingent commissions last year, the equivalent of more than half its $1.5 billion in income, Mr. Spitzer said. He called the comparison valid because, he said, Marsh performs few services in return for those payments, making them highly profitable.

Mr. Spitzer's complaint cites internal communications in which Marsh and insurers openly discussed actions to maximize their revenues. In one, a Marsh executive noted that the size of contingent commissions will determine "who we are steering business to and who we are steering business from."

In a file memo included as a court document, an AIG underwriter said that a broker "wanted us to quote around $900,000" as the cost of coverage for one client, while another insurer bid $750,000.

The lawsuit also describes how Ace raised its bid in 2002 on a policy for a manufacturer to $1.1 million from $990,000 allegedly at Marsh's request "to be less competitive, so AIG does not lose the business," the complaint says, quoting an Ace e-mail.

A Marsh official later allegedly warned Ace to continue providing inflated bids, or "B quotes," adding, "I do not want to hear that you are not doing B quotes or we will not bind anything," according to the lawsuit. Insurers refer to placing business as "binding" it.

Similarly, the lawsuit contends, one Marsh executive "warned that AIG would lose its entire book of business with Marsh" if the insurer didn't provide inflated quotes to clients at Marsh's behest.

Mr. Spitzer said that evidence uncovered in the probe suggests that illegal and improper practices extend to "virtually every major insurance broker" and through every line of insurance, including personal auto coverage, health insurance, life insurance and employee benefits. He declined to elaborate.

62.    On October 14, 2004, at 10:59a.m. est., the market began reacting to the news. By the end of the day, as a result of the announcement by the Attorney General of the State of New York, the common stock of ACE closed at $36.47 per share, down $3.84 per share, or 9.5%, wiping out $1.09 billion of the Company's market capitalization. The market continued to digest the news and by October 20, 2004, the stock had dropped another $2.47 per share. Wiping out an additional $701 million of the Company's market capitalization.

## SCIENTER ALLEGATIONS

63.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding ACE, their control over, and/or receipt and/or modification of ACE's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning ACE, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

64.    At all relevant times, the market for ACE securities was an efficient market for the following reasons, among others:

(a)    ACE's stock met the requirements for listing, and was listed and actively traded on the ACE, a highly efficient and automated market;

(b)    As a regulated issuer, ACE filed periodic public reports with the SEC and the NYSE;

(c)    ACE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    ACE was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

65.    As a result of the foregoing, the market for ACE's securities promptly digested current information regarding ACE from all publicly available sources and reflected such

information in ACE's stock price. Under these circumstances, all purchasers of ACE securities during the Class Period suffered similar injury through their purchase of ACE securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ACE who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

67.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff

and other members of the Class to purchase ACE securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

69.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ACE securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of ACE as specified herein.

71.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ACE's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ACE and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of ACE securities during the Class Period.

72.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was comprised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

73.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ACE's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ACE securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of ACE's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired ACE securities during the Class Period at artificially high prices and were damaged thereby.

75.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the true financial position, operating conditions and expenses that ACE was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their ACE securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.    Once the defendants' unlawful practices were disclosed, the financial market reacted immediately, with the price of the common stock of ACE declining approximately 24% that same day, reflecting the extent to which the market had been deceived by defendants' omissions throughout the Class Period.

77.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of The Exchange Act
Against the Individual Defendants**

79.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

80.    The Individual Defendants acted as controlling persons of ACE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

82.     As set forth above, ACE and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(A)     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(B)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 21, 2004                 Respectfully submitted,

                                        **WOLF HALDENSTEIN ADLER**
                                        **FREEMAN & HERZ LLP**

                               By: _____
                                        Fred Taylor Isquith, Esq. (FI 68721)
                                        Mark C. Rifkin, Esq. (MR 0904)
                                        Gustavo Brukner, Esq. (GB 7701)
                                        Christopher S. Hinton, Esq. (CH 0759)
                                        270 Madison Avenue
                                        New York, NY 10016
                                        Telephone: (212) 545-4600
                                        Facsimile: (212) 545-4653

                                        **CHITWOOD & HARLEY**
                                        Martin D. Chitwood
                                        Lauren D. Antonino
                                        2300 Promenade II
                                        1230 Peachtree Street, NE
                                        Atlanta, GA 30309
                                        (404) 873-3900

                                        Attorneys for Plaintiff

379237